IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

SANDRA A. ROGERS                                          PLAINTIFF


v.                          Case No. 3:09-cv-184–DPM


NATIONAL HEALTHCARE OF NEWPORT, INC.
a/k/a HARRIS HOSPITAL; DR. FRAN DUKE; and
AETNA LIFE INSURANCE COMPANY                      DEFENDANTS


## ORDER

Sandra Rogers sued her former employer, National Healthcare of
Newport, Inc. (commonly known as Harris Hospital), claiming that the
Hospital terminated her longtime employment in violation of the American
with Disabilities Act of 1990.  Rogers also contends that her treating doctor,
Fran Duke, violated her patient-privacy rights and should be held accountable
for doing so under the Health Insurance Portability and Accountability Act
of 1996.  In addition, Rogers alleges that Harris Hospital and Dr. Duke are,
under Arkansas law, in breach of an implied contract of employment.

Aetna Life Insurance Company is in the case because Rogers, while a
Hospital employee, paid premiums to Aetna on a long-term disability policy
through payroll deductions.  Rogers made a claim on that policy but Aetna

has not yet paid the claim; in fact, Aetna has not made an initial administrative decision on Rogers's disability claim. Rogers has sued Aetna for coverage under the policy.

## I.

All the Defendants move for summary judgment. Most of the material facts are undisputed; the Court assumes the disputed ones to be as Rogers asserts, and gives her all reasonable inferences arising from the proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

Harris Hospital hired Sandra Rogers in 1973 as a nurse's aide. She later worked as a LPN until 1985; at that time she began working for a pediatric clinic associated with the Hospital. In 2000, Harris Hospital rehired Rogers as an emergency-room nurse. One of the emergency-room physicians that she worked with was Dr. Fran Duke. In March 2008, Rogers was selected to work as a nurse at a clinic in Newark, Arkansas that Harris Hospital owned. The Hospital had picked Dr. Duke to be the physician at the Newark clinic. Dr. Duke and Rogers had discussed the possibility of Rogers becoming Dr. Duke's nurse at the clinic; part of that discussion included that a clinic

position would be physically easier for Rogers than the emergency-room job. Rogers told Dr. Duke that, in November 2007, she had been diagnosed with multiple sclerosis.  (Rogers had also been diagnosed, at one time or another, with emphysema, heart problems, and restless-leg syndrome.)  Rogers was not Dr. Duke's patient when she divulged this health information to the doctor.

In June 2008, some of Harris Hospital's clinics were not earning enough money.  CEO Chip Camp decided to eliminate positions within the clinics.  To that end, Camp went to the Newark clinic to discuss options with Dr. Duke, the clinic's doctor.   The two had a meeting about two vulnerable positions — Rogers's LPN position and an x-ray technician position.  Camp decided to dissolve the nurse position because Dr. Duke could perform the duties Rogers was licensed to do.  Dr. Duke could not take x-rays.  After Camp told Dr. Duke that he was going to eliminate the LPN position, and while leaving their meeting, Dr. Duke said she hoped the decision would not cause Rogers's multiple sclerosis to flare up.  Harris Hospital says this was the first time Camp learned Rogers had multiple sclerosis.  Rogers disputes this contention.

-3-

The parties agree that Camp met with Rogers within minutes after his meeting with Dr. Duke and told Rogers the LPN position was being administratively eliminated at the end of the next business day. Rogers went to the clinic the next morning, collected some personal items, and left.

Soon after Camp's Newark visit, he held a second meeting with Rogers; the purpose was to discuss her future options. Here is where some confusion crept in. Rogers, Camp, the Hospital's Human Resource Director Margaret Gates, and the Hospital's Chief Director of Nursing Judy Haney were at this meeting. Rogers asked about her options, and Camp noted three: Rogers could wait for a position to open at the hospital; she perhaps could take a summer leave of absence; finally, she could accept a severance package.

The first option related to an anticipated LPN position that Nursing Director Haney said might open at the Hospital's Senior Care unit, which was scheduled to open August 2008. After some investigation the summer-leave option evaporated because granting Rogers this leave was contrary to Hospital policy. The severance option remained.

What exactly Rogers understood when the second meeting ended is contested. She acknowledges, however, that she knew her job was eliminated

-4-

and no other position was then available—except maybe a night-shift position in labor and delivery. Rogers also says she knew, in any event, that her employment ended by mid-July 2008. That is when Human Resource Director Gates reiterated the severance-package option and mailed Rogers the paperwork. Rogers did not sign the forms. Nor did she ever apply for any other position at Harris Hospital. After Rogers left the clinic, the Hospital hired a non-licensed receptionist/bookkeeper to work there. About ten months after Rogers's departure, at Dr. Duke's request, the Hospital transferred a LPN from the Hospital to the clinic. The Newark clinic carried on a bit longer but closed in 2010 for financial reasons.

## II.

The discrimination claim under the American with Disabilities Act is the core of Rogers's complaint. The ADA prohibits discrimination by Harris Hospital "against a qualified individual on the basis of disability[.]" 42 U.S.C.A. § 12112(a) (West Supp. 2010). The Act also protects Rogers if the Hospital regarded Rogers as disabled. 42 U.S.C.A. § 12102(1)(c) & (3)–(4) (West Supp. 2010). Harris Hospital, the main target of Rogers's ADA claim,

concedes that the Act applies. The contested question is whether the Hospital intentionally discriminated against Rogers based on a disability.

Absent direct evidence of discrimination, of which the Court sees none, the *McDonnell Douglas* burden-shifting analysis applies. *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). This means Rogers must first establish a *prima facie* case on three points: she had a disability under the ADA; she was qualified, with or without a reasonable accommodation, to perform the essential job functions of a LPN; and she suffered an adverse employment action at the Hospital's hand because of her disability. If Rogers makes a *prima facie* case, then the Hospital must state some legitimate, nondiscriminatory reason for the hospital's actions. *Ibid.*

If Harris Hospital provides a legitimate, nondiscriminatory reason for Rogers's termination, then she must show that the Hospital's stated reason was a phony excuse for actual discrimination. "To prove pretext, [Rogers] must do more than show that the employment action was ill-advised or unwise, but rather must show that the [Hospital] has offered a phony excuse." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (quotations omitted).

## III.

Rogers's ADA claim boils down to this:   she says the Hospital discriminated against her based on a disability when CEO Camp told her that the LPN position at the Newark clinic was being "eliminated."   Rogers contends that Camp "was aware that Rogers had MS prior to notifying her that her position was going to be eliminated." *Document No. 29, at 22.* The record shows that Camp's visit to the Newark clinic was to discuss cutting one of two jobs because of the clinic's weaker-than-expected profits.   A job was going to be eliminated.   The Hospital contends the LPN post was scrubbed because Dr. Duke could perform that position's duties but not the x-ray technician's—the other position up for elimination.

Rogers acknowledges that, before Camp informed her of the elimination, he had never said anything to her indicating that he would discriminate against someone with a disability.   For his part, Camp testified that he did not discuss Rogers's health with Dr. Duke before or during the meeting.   Camp said:   "after we had made the decision, when we were breaking up our meeting, [Dr. Duke] made the comment something to the effect that I hope this doesn't cause her—this additional stress doesn't cause

her MS to flare up." *Document No. 28-8, at 8–9.* "And that was the first time I knew about Ms. Rogers' condition." *Document No. 28-8, at 4.* Other testimony indicates that Camp did not know Rogers had multiple sclerosis before he went to Newark to talk with Dr. Duke about the clinic's financial problems.

There is a dispute, though not a material one, about available positions after Camp told Rogers her job was eliminated. The Hospital says it told Rogers about a night-shift position in labor and delivery but Rogers declined to interview. Rogers acknowledges the job was mentioned and says she would have been interested in the job. But Rogers does not say she interviewed for the position and was rejected. Rogers also asserts that, after her termination, the Hospital advertised available nursing positions but she was not offered one of them. The Hospital counters that Rogers never applied for any position and that some of the positions required a registered nurse license, which Rogers did not hold. Both parties are right: Exhibit 9 to Rogers's deposition is an advertisement by Harris Hospital. It lists some RN positions, but the ad also publishes the need for a "LPN/NA" in "Medical/Surgical Unit" and a "LPN" at "Behavioral Health Unit." *Document*

*No. 28-5, at 33; Document No. 28-8, at 13.*

The Hospital says Rogers failed to establish the third element of her *prima facie* case — that she suffered an adverse employment action because of her disability.  Though somewhat inclined to agree with the Hospital, the Court gives Rogers the benefit of the doubt and concludes that she has made a *prima facie* case for discrimination under the ADA.  The Court must therefore decide if the Hospital proffered a legitimate, nondiscriminatory reason for terminating Rogers.  *Henderson*, 403 F.3d at 1034.  It did.  Ample proof shows that the stated reason for eliminating the job was the Hospital's system-wide crackdown on unprofitable clinics.  This means that, for summary-judgment purposes, Rogers's ADA claim turns on whether she can establish a genuine dispute of fact on pretext and offer sufficient evidence for a reasonable fact-finder to infer discrimination.  *Lors*, 595 F.3d at 834.  The Hospital argues that Rogers cannot do so.  Rogers disagrees.

As part of her pretext argument, Rogers says that "[w]hether Camp was aware of Rogers' disability when he made the decision to eliminate the position is hotly disputed."  *Document No. 29, at 37*.  What does the record say?  Camp testified that he knew nothing about Rogers's MS before he cut

her position.  Nursing Director Haney knew Rogers had been diagnosed with

multiple sclerosis before Camp decided to eliminate the Rogers's position at

the clinic.   Haney testified that she was involved in discussions about

eliminating the position, but only in terms of how nursing responsibilities

could be filled; she was not "involved in deciding that . . . Sandy's position

would be the one that would be terminated or deleted." *Document No. 28-9,*

*at 3.* Instead, Haney was generally involved in "how [the Hospital was] going

to reduce workforce[.]" *Document No. 28-9, at 3.* Haney also testified that she

never discussed Rogers's health issues with anyone, and that those health

issues did not enter her mind "when the decision to eliminate [Rogers's]

position was made[.]" *Document No. 28-9, at 7–8.* Everyone agrees that Dr.

Duke knew about Rogers's MS before she met with Camp.

Rogers also argues in low tones that the costs associated with her health

problems "might have had something to do with the decision to discharge her

because she was a liability." *Document No. 29, at 7.* She offers no proof,

however, that the Hospital ended her employment because she made claims

on her health insurance.

-10-

A pillar of Rogers's pretext argument is that the Hospital's stated reason for eliminating her job was bogus because "two new employees [were] hired to perform her responsibilities." *Document No. 29, at 37*. The Hospital points to four parts of the record in response. First, after Rogers left the clinic the Hospital hired a non-licensed receptionist/bookkeeper who was paid less than licensed staff like Rogers. Second, clinic business improved sporadically after Rogers left. Third, ten months passed after Rogers's position was cut before the Hospital laterally transferred LPN Christy Husky to the Newark clinic. Finally, during LPN Husky's trial period, the x-ray technician was fired for cause, which amounted to a reduction in the clinic workforce.

Viewing all the proof in a light most favorable to Rogers—and giving her the benefit of all reasonable inferences—has she raised a jury question? The Eighth Circuit has recently explained Rogers's burden:

> To demonstrate pretext, [Rogers] must present sufficient evidence to demonstrate both that [the Hospital's] articulated reason for the adverse employment action was false and that discrimination was the real reason . . . [Rogers] must do more than simply create a factual dispute as to the issue of pretext; [s]he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*Lors*, 595 F.3d at 834 (internal quotation omitted).

-11-

No one disputes that, in summer 2008, Camp had decided to eliminate a total of five positions in the Hospital-owned clinics. The Hospital consistently advanced lack of profitability as a reason for eliminating positions, including the LPN job at the Newark clinic. Camp also said he did not learn about the diagnosis until right after he and Dr. Duke met and he had already decided to eliminate Rogers's position. Dr. Duke's testimony corroborates Camp's. Nursing Director Haney testified in her deposition that, in her discussions with decision-makers, Rogers's multiple sclerosis was not raised. Haney went further, saying she never even thought about Rogers's medical condition during the job-cut talks. It is, however, undisputed that Haney and Dr. Duke knew about Rogers's MS before those discussions were held.

Rogers disputes what Camp knew about her multiple sclerosis when he actually decided to dissolve the LPN job. But Rogers's opposition rests on speculation, not proof. Rogers's ADA claim cannot survive summary judgment based on the possibility that Dr. Duke or Nursing Director Haney may have told Camp about Rogers's health problems before Camp actually decided to eliminate her position. Yet this is essentially Rogers's position. All

-12-

the testimony converges on the point, however, that Camp did not know about Rogers's multiple sclerosis before he decided to cut her job.  The contrary possibility pressed by Rogers cannot support the "necessary inference" that the Hospital eliminated the position "more likely than not based on a discriminatory criterion illegal under federal law."  *Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 658 (8th Cir. 2001).

Rogers testified that Camp had never "said anything to [her] that would indicate or lead [her] to believe he would discriminate against somebody on account of their disability[.]" *Document No. 28-4, at 28*.  Important undisputed facts also include these:  cost concerns permeated the Hospital's talks on eliminating staff positions; Rogers never applied for another position at the Hospital; a LPN was not rehired at the clinic until about ten months after Rogers left; and the clinic closed its doors in 2010 because it did not make money.  Finally, Rogers has not shown that the Hospital treated similarly situated employees differently — one way that she could have shown pretext, raised an inference of discrimination, and gotten to a jury. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 770 (8th Cir. 2008).

-13-

Rogers was understandably bewildered by Harris Hospital's clunky handling of her situation after Camp told her that her job had evaporated. But the record shows no link between Camp's decision and Rogers's disability. The Hospital's elimination of her position was a business decision uninfected with intentional discrimination. *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

Two final points. First, to the extent Rogers rests her ADA claim on the notion that the Hospital failed to accommodate her, which she says is "evidence of intent and pretext", the Court disagrees. The Court has considered Rogers's accommodation-related argument but sees no triable issue after applying the governing law to this record. *Ballard v. Rubin*, 284 F.3d 957, 960–64 (8th Cir. 2002). Second, the Court is not persuaded by Rogers's argument that she was retaliated against for calling a hotline to ask about her employment status — a call during which Rogers said she expressed some concern about being a "liability" given her health and that she was being pushed into a corner "a little bit" in addition to seeking clarification of her employment status. *Document No. 28-4, at 22–24*. Resolving every doubt in her favor, the retaliation claim falters because Rogers called the hotline

-14-

days after Camp had told her that the clinic's LPN job was eliminated and after the severance-package option had been presented to her.

## IV.

Harris Hospital and Dr. Duke also seek a judgment as a matter of law on these two claims: a HIPAA-based privacy claim; and an implied breach of an employment agreement under Arkansas law. Rogers's attempt to state a federal claim for a HIPAA violation stumbles on the law. Multiple courts have addressed the issue and declined to recognize a private claim for relief. *E.g., Adams v. Eureka Fire Protection District*, 352 F. App'x 137, 138–39 (8th Cir. 2009) (*per curiam*) (collecting cases). This Court agrees: Rogers has no viable HIPAA claim.

The claim against the Hospital for breaching an implied employment contract fails on the law and the proof. Arkansas is an at-will employment state, *Magic Touch Corp. v. Hicks*, 99 Ark. App. 334, 335–36, 260 S.W.3d 322, 324 (2007), so Rogers has a hard trek to a jury. Rogers admits that there is no written employment agreement. This means she must point to a personnel manual or handbook containing an express provision that prevented the Hospital from terminating her absent a cause to do so. *Ibid.* Rogers has not

done so. Nor has she seriously argued against the Hospital and Dr. Duke's motion that she had an unwritten—but legally enforceable—employment contract. Because the Court has no proof of an implied contract between the parties there is no issue for a jury to decide.

## V.

Now to Rogers's claim against Aetna for failing to pay her long-term disability benefits. Aetna asks the Court to apply either judicial estoppel or the inconsistent-positions doctrine. *Mitchell v. Ramsey*, 2011 Ark. App. 9, at 5–8. Rogers is barred, Aetna says, from telling the Court and Aetna, on the one hand, that she is disabled and cannot "perform the material duties of [her] own occupation solely because of" her multiple sclerosis and, on the other hand, telling the Court and Harris Hospital that she was willing and able to continue working as a nurse. *Document No. 23–1, at 10.* Aetna asserts that Rogers has incompatibly (and impermissibly) maintained "that she was perfectly capable of doing her job until the position was eliminated" and that Harris Hospital "should have given her a different and more strenuous job, but with accommodations." *Document No. 41, at 1.*

-16-

If the Court concludes that an outright dismissal of Rogers's claim with prejudice is not warranted based on estoppel, then Aetna says the Court should sever the ERISA claim from the case and remand the long-term disability claim to the claim administrator so it can make an initial determination on the merits of Rogers's claim.  In response, Rogers disputes that she has taken inconsistent positions in a way that triggers judicial estoppel.  Rogers has not, however, contested Aetna's request to send the disability claim back to determine whether she is disabled under the policy.

The Court dismisses Rogers's ERISA claim against Aetna without prejudice so the claim administrator can do its work and determine in the first instance—according the parties' contract and the facts the parties deem most pertinent—whether Rogers has satisfied the policy's terms and is therefore entitled to long-term disability benefits. *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1005–06 (8th Cir. 2005) (*en banc*).  While acknowledging Aetna's request to send the ERISA claim back to the administrator for review, the Court concludes the better course is to dismiss without prejudice.

A remand implies that the Court would keep the case on its docket while the parties complete the claim-administration process.  The Court

-17-

declines to do this for two reasons.  First, the parties agree that Aetna has not made an initial benefits determination, which means that Aetna and Rogers are not merely in a holding pattern pending some minor clarification from an administrator that the parties can promptly supply to the Court.  Second, if Rogers and Aetna still have a legal dispute about benefits after the claims-administration process is completed, then either one of them may file a new case and seek appropriate relief.

* * *

Harris Hospital and Dr. Fran Duke's motion for summary judgment, *Document No. 16*, is granted.  Rogers's ADA-discrimination claim against Harris Hospital and her HIPAA-based claim against Dr. Duke are dismissed with prejudice.  Rogers's claim for breach of an implied employment contract is dismissed with prejudice too.  The Court grants Aetna's motion for summary judgment, *Document No. 21*, in part and denies it in part.  Rogers's claim against Aetna on the disability policy is dismissed without prejudice so she may pursue and administratively exhaust her claim.

So Ordered.

_D.P. Marshall Jr._
United States District Judge

_18 February 2011_